Janet Vincent et al., Respondents, v Ralph B. Thompson et al., Appellants.

Second Department, December 22, 1975

See *Vincent v Thompson,* 79 Misc 2d 1029.

*Davis Polk & Wardwell (Lawrence E. Walsh, Guy Miller Struve* and *Richard J. Cunningham* of counsel), and *D'Amato, Costello & Shea (Joseph M. Costello* and *Richard C. Browne* of counsel), for Parke, Davis & Company, appellant.

*Martin, Clearwater & Bell (William F. Martin* of counsel), for Ralph B. Thompson, appellant.

*Meyer, English & Cianciulli, P. C. (Bernard S. Meyer* and *James Oliviero* on the brief), and *Joseph T. Mirabel (Walter Wortman* on the brief), for respondents.

SHAPIRO, J. Defendants Ralph Bernard Thompson and Parke, Davis & Company (Parke, Davis) appeal from a judgment of the Supreme Court, Nassau County, entered upon a jury verdict, which, *inter alia,* awarded plaintiff Janet Vincent damages in the amount of $300,000 for personal injuries allegedly sustained by her as the result of the administration by Dr. Thompson of a quadruple vaccine called Quadrigen, manufactured by Parke, Davis. The action has been settled as against Dr. Thompson.[1] We reverse the judgment as to Parke, Davis, on the law, and grant a new trial as against it.

In *Tinnerholm v Parke, Davis & Co.* (285 F Supp 432, affd 411 F2d 48), the District Court, as the trier of the facts, found that (p 53) "Quadrigen was defective and that the defect was the proximate cause of the injury sustained by Eric Tinnerholm", the infant plaintiff therein. In this case, at the outset of the trial, the plaintiffs moved for a determination that the

---

1. Dr. Thompson was also adjudged liable to coplaintiff Taylor E. Smith, Janet Vincent's father, for medical expenses incurred as a result of her injuries. Mr. Smith was unable to assert such a claim against Parke, Davis because his claim against it was barred by the Statute of Limitations. The codefendant, Dr. Thompson, has, since the argument of this appeal, settled his case with the plaintiffs and a stipulation to that effect has been received by this court.

decision in the *Tinnerholm* case acts as a collateral estoppel against Parke, Davis as to the defectiveness of Quadrigen. The trial court granted the plaintiffs' motion and instructed the jury—at the very commencement of the trial and before any proof had been taken—that it should consider the following facts as established against Parke, Davis:

"One. The vaccine, 'Quadrigen', which is manufactured by the defendant Parke, Davis, was released to the public market without adequate prior testing in the face of evidence that the vaccine was unstable.[2]

"Two. The vaccine 'Quadrigen', was defective as a product in view of the leakage of toxins from within the pertussis component of the vaccine, which leakage was caused by this preservative 'phermeol'."

We are of the opinion that, because of the basic difference between the facts in this case and those in *Tinnerholm,* the trial court erred in applying the doctrine of collateral estoppel.

### THE FACTS HERE

On June 27, 1960 Dr. Thompson was called by Mrs. Gaylord E. Smith, who told him that her daughter, Janet, then 13 years of age, had stepped on a nail with her left foot the previous day. Dr. Thompson testified that he took some tetanus toxoid, some duracillin and some polio vaccine with him to the Smith home because Janet hadn't had the latter since the previous August. He injected this mixture into Janet's shoulder. He denied having injected Janet with Quadrigen. That drug is Parke, Davis' name for the four-in-one shot which combines "diphtheria and tetanus toxoids into a triple antigent product (colloquially known as 'DTP')" *(Tinnerholm v*

---

2. This finding against Parke, Davis on the basis of collateral estoppel is especially surprising in view of the fact that, while the finding of inadequate testing was made as an alternative finding by the District Court in *Tinnerholm,* the Court of Appeals expressly held that such finding was unnecessary to the decision, saying (411 F2d, at p 53): "We therefore hold that there was sufficient evidence to support the finding of the court below that defendant-appellant, Parke, Davis' product 'Quadrigen was defective and that the defect was the proximate cause of the injury sustained by Eric Tinnerholm.' Since appellant does not dispute the District Court's ruling that this finding justifies the imposition of liability on an implied warranty of merchantability theory, it is unnecessary to discuss the alternative basis of liability which rests on negligence".

In such a situation the doctrine of collateral estoppel does not apply to the alternative theory upon which the recovery was based (see *Hannahville Indian Community v United States,* 180 US Ct Cl 477, 485).

*Parke, Davis & Co., supra,* p 50). The next morning he received a call from the Smiths informing him that Janet was weak, could not sit up and had trouble moving her right leg. He visited Janet immediately after the call and diagnosed her illness as between a myelitis and polio, although he thought it was an atypical polio. He had her admitted to Meadowbrook Hospital. The final diagnosis of Janet's illness made in Meadowbrook Hospital was that she had "transverse myelitis, etiology unknown". In August, Janet was sent from Meadowbrook Hospital to the Rusk Institute for rehabilitation. The records there state that "attempts were made to clarify the etiology of the illness without any definite results." So far as the medical records and the testimony disclose, *Janet never had an abnormal fever reading at any time after the injection.*

Although Dr. Thompson denied that he had injected Janet with Quadrigen, there is sufficient other testimony in the record to sustain a contrary finding.

### THE FACTS IN TINNERHOLM

On the basis of substantial evidence the trial court found that at about noon on Saturday, November 28, 1959, the infant plaintiff, Eric Tinnerholm, then sound and healthy, was inoculated by a Dr. Feinberg with Quadrigen. On Tuesday morning, December 1, 1959, at about 4:00 A.M., the child was found tangled up in his bedclothes and whimpering; upon being picked up and patted, he quieted down and presumably went back to sleep. There was no indication of temperature at that time. Sometime later, between 6:30 and 7:00 A.M., the child's mother found him huddled under the covers, lethargic and bathed in perspiration. *His temperature at that time was 108 degrees,* he was very white, his lips were blue and he was limp. Dr. Feinberg was summoned, and he had the baby admitted to Huntington Hospital at 8:45 A.M., where the infant remained until December 18, 1959. During that time he developed recurrent convulsive seizures and paralysis of the right arm and leg. At the time of trial he was, and will remain, mentally retarded (with a mental age of five months) to a degree classified within the idiot-imbecile range; he is paralyzed in both right limbs and still suffers occasional seizures *(Tinnerholm v Parke, Davis & Co.,* 411 F2d 48, 50, *supra).*

The Court of Appeals noted in *Tinnerholm* (p 51):

"The findings of the court below in support of its conclusion

that Parke, Davis is liable to plaintiffs-appellees may be summarized as follows:

"1. '* * * by manufacturing Quadrigen in the method chosen by defendant, the chances of contracting an encephalopathy were enhanced,' because:

"2. '* * * the effect of the use of benzethonium chloride was to release the endotoxin from the bacteria cell into the fluid that was injected. One such endotoxin, the lipopolysaccharide, causes fever * * *'; and

"3. '* * * the release of the endotoxin into the fluid injected into the infant plaintiff was the cause of the unusually high fever which, in turn, caused the severe and permanent brain damage.' "

### THE BACKGROUND OF QUADRIGEN

In order to understand the nature of the defect in Quadrigen, and its causal relationship to the injuries sued for in *Tinnerholm,* it is necessary to examine the origin and composition of that compound. In affirming the judgment below in *Tinnerholm,* the United States Court of Appeals, in its opinion, set forth that background (pp 50–51):

"Quadrigen was developed by Parke, Davis as a quadruple antigen product, combining pertussis (whooping cough) vaccine, with diphtheria and tetanus toxoids and with the Salk polio vaccine. In the early 1940's, a method of combining pertussis vaccine with diphtheria and tetanus toxoids into a triple antigent product (colloquially known as 'DTP') had been developed. The Parke, Davis DTP was marketed under the trade name 'Triogen.'

"Vaccines are intended to stimulate the production of antibodies in order to confer protection against disease by introducing an antigenic factor into the body of the recipient. In developing a vaccine in the cases of some infectious organisms, notably diphtheria and tetanus, it has been possible to isolate a soluble toxin or poison excreted by the bodies of these bacteria, and to inactivate this toxin with formaldehyde, thereby converting a toxin into what is called a toxoid. A toxoid preserves the ability to immunize against the disease by stimulating the production of antibodies in the recipient, although it has lost its own poisonous qualities.

"In contrast, the bacterial organism which causes pertussis is so complex that it has been impossible to isolate and

inactivate the toxin or poison. Since the ingredient in the pertussis bacteria which stimulates the production of protective antibodies has not been isolated, pertussis vaccine consists of whole pertussis bacteria, treated to remove their propensity to cause the disease, while preserving their ability to stimulate the production of protective antibodies.

"Some fifteen or sixteen different antigens have been described in the pertussis organism, including an exotoxin, an endotoxin, a protective antigen, etc. One or more of these antigens confers protective ability; no one knows which one or what it is. In the production of the pertussis vaccine, the exotoxin is destroyed by heat, but the endotoxins inside the cell survive such treatment. Because of the complex nature of the pertussis bacteria and the inability to isolate the toxin in order to inactivate it, reactions to pertussis vaccine are not uncommon. There may be local reaction, such as soreness or tenderness at the site of the injection, and systemic (attacking the entire body) reaction such as fever and general discomfiture. Rarely, reactions associated with the disease itself, such as convulsions, high fever, or even brain hemorrhage and mental retardation occur.

"All vaccines require a preservative to keep them sterile; and one of the problems confronting Parke, Davis in the development of Quadrigen was the selection of an appropriate preservative to protect the final product from contamination. In the development of pertussis vaccines and indeed all other vaccines, up until the development of polio vaccine (licensed for distribution in 1956), the preservative universally used was merthiolate. The preservative used in Parke, Davis' Triogen had been merthiolate, but because merthiolate had a deleterious effect upon the polio virus in the Salk vaccine, a new preservative had to be chosen. The preservative ultimately selected by Parke, Davis (and according to Parke, Davis, all other manufacturers of quadruple antigen products) was benzethonium chloride (trade name Phemerol). Quadrigen was developed during 1957 and 1958 and was licensed for commercial distribution by the National Institutes of Health in the spring of 1959. The first commercial distribution took place July 10, 1959."

## COLLATERAL ESTOPPEL

The doctrine of collateral estoppel stems from the doctrine of *res judicata,* at the core of which is the idea that society's

interests are better served by foreclosing repetitious litigation than by permitting litigants to show that the truth is otherwise than as found or assumed in a prior action. Collateral estoppel falls into the category of partial *res judicata* because its binding effect is limited to certain of the issues formerly in dispute, rather than extending to the entire controversy. When collateral estoppel operates, certain questions actually litigated and determined in one action are precluded from relitigation in a later action when the same questions arise anew, even in a suit on a different cause of action (Rosenberg, Collateral Estoppel in New York, 44 St Johns L Rev 165, 166).

Professor Maurice Rosenberg, in the above-cited article, noting that "the New York courts have set a hectic pace in expanding the applicability of collateral estoppel", adds that, despite this, the cases have generally accepted and adhered to several basic requirements. These are: the issue presented (1) was *identical;* (2) was actually litigated; (3) was essential to the determination; and (4) was "ultimate" or "material" in the prior action and is also "ultimate" in the present suit *(id.,* p 171). In *B. R. DeWitt, Inc. v Hall* (19 NY2d 141, 147), the Court of Appeals rejected the concept of mutuality of estoppel as a "dead letter", declaring, "[w]hile we have not expressly so held, the trend of our decisions leads to this conclusion (see 5 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 5011.42)." In *Schwartz v Public Administrator of County of Bronx* (24 NY2d 65), the same court declared (p 71): "Although we have not previously said so, it is now evident that New York has adopted the full and fair opportunity test in applying the doctrine of collateral estoppel * * * New York Law has now reached the point where there are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an *identity* of issue which has necessarily been decided in the prior action *and is decisive of the present action,* and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling" (emphasis supplied).

The Court of Appeals also declared in *Schwartz* (p 73): "No one would contend that the doctrine of collateral estoppel should be applied rigidly. In *De Witt* (19 N. Y. 2d 141, *supra),* however, we indicated that the burden rests on the defendant to show that collateral estoppel should not be applied because he did not have a full and fair opportunity *(supra,* p. 148), *just as the burden of showing that the issue was identical and*

*necessarily decided rests upon the moving party.* This apportionment of the burdens is both fair and necessary. Otherwise much of the value of collateral estoppel will be lost" (emphasis supplied).

Recognizing that the collateral estoppel doctrine should not "be applied rigidly", and then only when the issue which has been decided in the prior action "is decisive of the present action" and that the litigant urging the applicability of that doctrine has "the burden of showing that the issue was identical", we conclude that the trial court committed fundamental error in holding, as a matter of law, that the findings in the *Tinnerholm* case are applicable here and could not be contradicted by Parke, Davis.

Here, the plaintiffs utterly failed to sustain their burden of establishing that the issues in *Tinnerholm* and in this case were "identical" or that the issue actually decided in *Tinnerholm* "is decisive of the present action". The trial court, in its opinion handed down some months after the jury rendered its verdict, said: "The claim here, as in *Tinnerholm,* is that Quadrigen is unstable in its Pertussis component, that the preservative Phemerol caused a leakage of poisonous elements, and that the improperly tested drug was publicly released in face of signs of danger. *To this extent, the issues are absolutely identical*" (emphasis supplied). *(Vincent v Thompson,* 79 Misc 2d 1029, 1039.)

However, what the trial court overlooked, and what is not identical, is whether the unstable, *improperly tested component of the drug* caused Janet's injuries. That that is so is amply established by a comparison of the facts in each case, the illness suffered by each and the injuries resulting therefrom, all of which serve to make clear the complete lack of identity of the ultimate issue of whether there was a causal relationship between the defect in Quadrigen and the illnesses and consequent injuries suffered by the infant plaintiff in *Tinnerholm* and the infant plaintiff in this case. Such a comparison makes it crystal clear that they differed in every material respect. The *Tinnerholm* infant plaintiff was three months of age, the infant plaintiff here 13 years of age. In *Tinnerholm* the court found as a fact that the pertussis vaccine directly caused the 108 degree fever from which the infant plaintiff there suffered, which fever caused severe and permanent brain damage, which is sometimes a concomitant

of the administration of pertussis vaccine. Here, the infant plaintiff had no fever after the injection of Quadrigen and contracted not brain damage, but transverse myelitis, which, all of the doctors agreed, has never been reported to be associated with the injection of pertussis vaccine.

The foregoing comparison, when viewed in the light of the background and development of Quadrigen, demonstrates beyond doubt that the injuries suffered by the infant plaintiff in *Tinnerholm* were causally related to the defect shown to have existed in the pertussis vaccine component of Quadrigen, whereas those suffered by the infant plaintiff here could have been causally related, if there was any such relationship at all, only to the Salk polio vaccine component of Quadrigen. The *Tinnerholm* infant's injuries were linked by evidence introduced on behalf of the plaintiffs to a pertussis vaccine encephalopathy (defined as any degenerative disease of the brain). The trial court in *Tinnerholm* noted that pertussis is a communicable bacterially caused respiratory disease which may attack the brain to the extent that convulsions, high fever and, occasionally, hemorrhages in the brain are produced. In *Tinnerholm* the Court of Appeals noted that the failure of Quadrigen to insure destruction of the endotoxins contained in the pertussis vaccine may have been the source of the febrile reaction since such a reaction is usually attributed to the endotoxin. But, in the case of the infant plaintiff here, the 13-year-old Janet, the pattern of illness and resultant paralytic injuries is consistent with a reaction to the Salk polio vaccine component of Quadrigen, which, everyone agrees, was not an improper component of Parke, Davis' product.

Thus, it is clear that the ultimate issue in *Tinnerholm* as to the existence of a causal relationship between the administration of Quadrigen to the infant plaintiff and the ensuing injuries suffered by him is vastly different from the ultimate issue in the instant case. One turns upon the establishment of a defect in the pertussis vaccine component of Quadrigen and the other turns upon the establishment of a defect in the Salk polio vaccine component thereof. Hence, the trial court's invocation of collateral estoppel against Parke, Davis as to the defect in the pertussis vaccine component in violation of the identity-of-issue test for invoking the doctrine requires a reversal of the judgment as against that defendant.

RIGID APPLICATION OF THE DOCTRINE OF COLLATERAL
ESTOPPEL

Aside from the lack of identity of issues, this is not a case
where the conclusory testimony offered by the plaintiffs' ex-
pert, that the infant plaintiff's injuries were probably second-
ary to a DTP injection and that a bad vaccine would cause
neurological shock, is of sufficient credibility to sustain the
finding of causal relationship. There are too many other
possibilities which have a probability of accuracy at least as
great, or greater, that some factor other than the defect in the
pertussis component of Quadrigen caused Janet's injuries, to
permit the isolation of any single causal factor. Under such
circumstances, the doctrine of collateral estoppel which was
here applied must be scrutinized with extreme care and
caution, for, as the trial court aptly said in *Williams v
Laurence-David, Inc.* (— Ore —; 534 P2d 173, 178, n 1) and
which was quoted with approval by the Supreme Court of
Oregon sitting in banc: " 'What we are here concerned with is
the question of whether or not a given individual did react
physically to the use of a product which in this case is gloves,
is a matter of fact one — we must recognize one individual
might have an adverse reaction whereas another individual
might not. This isn't like a situation where you have an
automobile accident. There is one set of facts that creates the
damage and the injury' ".

Before quoting that statement the Supreme Court, itself,
said (p —; p 178): "Courts, therefore, should scrutinize with
care any situation where collateral estoppel is asserted by a
person who was neither a party nor in privity with a party to
the first case, to make certain no unfairness will result to the
prior litigant if the estoppel is applied."

In this case the record makes it clear that, aside from all
other considerations, it was unfair, for still another reason, to
bar Parke, Davis, under the theory of collateral estoppel, from
establishing that the defective pertussis component of the
Quadrigen had nothing to do with the infant plaintiff's illness.

Toward the end of the trial, Parke, Davis attempted to
introduce newly discovered evidence to dispute the essential
*Tinnerholm* findings. The trial court rejected its offer of proof
on the ground that it was untimely with respect to the trial
chronology and that the new evidence was unacceptable from
a scientific point of view. In our opinion that ruling was
clearly error and deprived Parke, Davis of an opportunity to

establish that the doctrine of collateral estoppel should not have been applied. The proof proffered by Parke, Davis came from Dr. Hodes, a pediatric immunologist, who testified that a new scientific test first developed after the *Tinnerholm* trial negated the defective pertussis theory utilized by the court in that case in deciding for the plaintiff therein. With that proffered proof in the record, submitted to the trial court in the absence of the jury, Parke, Davis' request to the trial court to have it withdraw its previous instruction to the jury on collateral estoppel and to permit the complete airing of all the issues was improperly denied.

Dr. Hodes' testimony established that there is now a direct way to test the basis of the theory adopted in *Tinnerholm,* which theory permitted a recovery by the plaintiff there. Dr. Hodes testified that he performed this newly discovered test on a bottle of Quadrigen and that he found no indication that any endotoxin was present. Dr. Hodes concluded that this test proved that endotoxins could not reach out of the dead pertussis bacilli in Quadrigen in any quantity sufficient to cause an untoward reaction in a human being. A Dr. Timm testified that the test performed by Dr. Hodes had first come to the attention of Parke, Davis at least three years after the *Tinnerholm* trial.

To allow the doctrine of collateral estoppel to be used to deny to a defendant in a case such as this an opportunity to introduce evidence clearly relevant to a key issue in the case, the absence or existence of a causal relationship between the claimed defect in the product produced by such defendant and used by the plaintiffs, and the injuries for which the plaintiffs are suing, is the use of that doctrine to deny such a defendant a complete and fair opportunity to litigate the very issue upon which its rights depend.

In *Schwartz v Public Administrator of County of Bronx* (24 NY2d 65, 72, *supra),* in which the Court of Appeals upheld the utilization of the collateral estoppel doctrine, it pointed out that "[f]inally, there is no assertion of any significant new evidence, which would almost certainly change the earlier result." Here, as we have noted, that precise kind of evidence was denied recognition by the trial court.

In rejecting the trial court's view that collateral estoppel can operate to foreclose the defendant in the instant case from introducing evidence discovered after the trial in *Tinnerholm* which is relevant to the issue of the existence of a causal

relationship between the defective pertussis components in Quadrigen and the disease (transverse myelitis) which attacked the infant plaintiff after she received the Quadrigen injection, we do not lay down any general rule as to the nonapplication of collateral estoppel in products liability cases. Clearly, there may be instances in which collateral estoppel may properly be invoked in such cases. An instance, for illustrative purposes, may be a situation in which a group of people, after eating the same food, are shortly thereafter stricken with food poisoning. (See, also, in this connection, the facts in *Parke-Davis & Co. v Stromsodt,* 257 F Supp 991, affd 411 F2d 1390.)[3]

Although the decision under review is the first, so far as our research discloses, in which, in a products liability action, a court held that collateral estoppel may be invoked by a plaintiff suing for injuries which allegedly resulted from a defect in the defendant's product, it has come to our attention that there have recently been two court rulings involving this issue. In one case involving Quadrigen, the trial court, in an unreported decision, followed the decision of the trial court in this case and invoked collateral estoppel against Parke, Davis *(Grant v Parke, Davis & Co.,* [E D Wis, Civ Action No. 71-C-27, dec May 5, 1975]). However, that ruling is of no precedential value since it was finally resolved by a jury verdict in favor of Parke, Davis.

A second such case was *Williams v Laurence-Davis, Inc.* (— Ore —; 534 P2d 173, *supra* ). There, the action, which was against a seller of rubber gloves, was based upon the claim that the plaintiff, a worker in a plywood factory, had contracted a contact dermititis as a result of his use of the defendant's rubber gloves. The Oregon Circuit Court granted the plaintiff's motion for a new trial after the jury found for the defendant; the defendant appealed. The Oregon Supreme Court refused to allow the plaintiff to invoke the collateral estoppel doctrine despite the fact that it had theretofore, like the Court of Appeals of New York, repudiated the requirement that there be mutuality before estoppel could be applied

---

**3.** *Stromsodt* was a case which involved issues identical with those in *Tinnerholm.* If it had been decided before and became known to the plaintiffs in *Tinnerholm,* the *Tinnerholm* court could have allowed the plaintiffs to invoke it as the basis for collateral estoppel against Parke, Davis as to the issue of causation of the infant plaintiff's injuries by the pertussis defect in Quadrigen. The question, however, is one which must be resolved on a case-by-case basis by means of the application of the tests set forth in *Schwartz v Public Administrator of County of Bronx* (24 NY2d 65).

(see *Bahler v Fletcher*, 257 Ore 1). The plaintiff's effort to invoke collateral estoppel was based upon the fact that, in a products liability action by another worker in a plywood factory, a Mr. Krall, based upon his having been injured as a result of his use of the defendant's gloves, there was a finding that the defendant's gloves were defective. In denying the plaintiff in *Williams* the right to invoke collateral estoppel the Supreme Court of Oregon said (pp ——; pp 177–178):

"In *Bahler v Fletcher,* 257 Or. 1, 474 P. 2d 329 (1970), this court abandoned the doctrine of mutuality as a requirement for application of the rule of collateral estoppel by judgment. In that case the court also declined to adopt the distinction recognized by some courts under which defendant, but not plaintiff, could seek the application of that rule and recognized that it may properly be applied on behalf of 'multiple claimants' against a single defendant, as when many persons are killed in a single airplane crash. We said, however (at 18, 474 P. 2d at 337), that:

" ' * * * [C]ollateral estoppel should not be used in the multiple claimant anomaly situation when unfairness would result. * * *' and (at 19–20, 474 P. 2d at 338) that:

" '* * * [M]any reasons revolving around other policy considerations militate against giving carte blanche permission to bar relitigation of issues previously decided to persons who were neither a party nor in privity with a party to the original litigation when subsequently litigating with one who was. *Courts, therefore, should scrutinize with care any situation where collateral estoppel is asserted by a person who was neither a party nor in privity with a party to the first case, to make certain no unfairness will result to the prior litigant if the estoppel is applied' "* (emphasis supplied).

We fully subscribe to that statement and, in view of the facts in this record, it is particularly apt here.

### THE HEARSAY ISSUE

Since we are granting a new trial, we feel that we should comment on the hearsay contentions raised by Parke, Davis. It contends that the only testimony offered to establish that Quadrigen was administered to the infant plaintiff prior to her developing transverse myelitis was hearsay as to it and, therefore, that it cannot serve to sustain any verdict for the plaintiffs. We find this contention lacking in merit. It is true

that the only evidence that the drug administered to Janet by Dr. Thompson was Quadrigen came from testimony by her mother and father that, on two separate occasions, Dr. Thompson told each of them that the biological he had administered to Janet after she stepped on a nail and before she fell ill was Quadrigen. Clearly this was hearsay evidence so far as Parke, Davis was concerned, but, in its memorandum opinion in *People v Arnold* (34 NY2d 548, 549–550), the court observed "that this court has in recent years emphasized that the hearsay doctrine has been too restrictively applied to exclude otherwise reliable evidence from the jury (see, e.g., *People v Brown*, 26 N Y2d 88; *Letendre v Hartford Acc. & Ind. Co.*, 21 N Y2d 518)." The underpinning for the rule excluding hearsay is that the purported utterer of the quoted statement cannot be subjected to cross-examination for purposes of casting full light on the information contained therein (see *Coleman v Southwick*, 9 Johns 45, 50). However, since the utterer of the original statement which is the source of the hearsay testimony complained of, Dr. Thompson, testified on the subject matter of the hearsay, as did those presenting the hearsay testimony, Janet's father and mother and the party raising the hearsay objection, Parke, Davis, had a full opportunity to cross-examine and confront all those witnesses at the trial, the hearsay rule should not be applied to bar the testimony. As Wigmore comments, "the Hearsay rule, as accepted in our law, signifies *a rule rejecting assertions, offered testimonially, which have not been in some way subjected to the test of Cross-examination*" (5 Wigmore, Evidence [3d ed], § 1362 [emphasis in original]).

In *Letendre v Hartford Acc. & Ind. Co. (supra)*, the trend toward relaxation of the hearsay rule, was also manifested. In that case, one involving a hearsay admission against penal interest, the Court of Appeals said (21 NY2d, at p 524):

"Admittedly, Tremblay's statements were hearsay. Nevertheless, none of the classic dangers, which justify the hearsay rule, are present in this case. Hence, a departure from the general rule excluding hearsay evidence is proper here.

"Declarant himself was present in court, subject to the oath and the safeguard of cross-examination. (See 5 Wigmore, Evidence [3d ed.], §§ 1361–1363; McCormick, Evidence, pp. 457–459.) The jury had ample opportunity to assess his credibility."

The court then went on to state that, in reaching its

conclusion, it adhered to the views expressed by Chief Judge FULD in his concurring opinion in *Fleury v Edwards* (14 NY2d 334, 341) in which he said: "The common law of evidence is constantly being refashioned by the courts of this and other jurisdictions to meet the demands of modern litigation. Exceptions to the hearsay rules are being broadened and created where necessary. * * * Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts in civil cases."

Under the circumstances, the only way the hearsay evidence in question could be deemed inadmissible against Parke, Davis would be by a rigid and slavish adherence to a black-letter rule. We should not thus elevate form over substance in disregard of the requirements of justice. (See, in this connection, *Dallas County v Commercial Union Assur. Co.,* 286 F2d 388, 398 and *United States v Nuccio,* 373 F2d 168.) In view of the foregoing, we do not reach the question whether the hearsay rule has outlived its usefulness and should no longer in any event be considered viable in products liability cases such as this.

CONCLUSION

While, on the whole case, the plaintiffs failed to establish by a fair preponderance of the evidence that it was the pertussis vaccine in Quadrigen which was responsible for Janet's injuries, it may be that the trial court's erroneous invocation of the doctrine of collateral estoppel, albeit at plaintiffs' insistence, lulled them into a false sense of security and caused them to fail to present evidence which may have been relevant to the establishment, to the jury's satisfaction, that the injuries suffered by the infant plaintiff came from the injection of a defective ingredient in Quadrigen. Under such circumstances, the plaintiffs should be afforded an opportunity to present evidence on that issue. The judgment appealed from should, therefore, be reversed insofar as it is against Parke, Davis, and a new trial granted.

RABIN, Acting P. J., HOPKINS and MUNDER, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered May 1, 1974, reversed, on the law, as against defendant Parke, Davis & Company, and new trial granted as between plaintiff Janet Vincent and the said defendant, with costs to abide the event.

Appeal by defendant Ralph Bernard Thompson dismissed, without costs.