Sadie Shaid, Respondent, v Consolidated Edison Company of New York, Inc., Appellant.

Second Department, October 24, 1983

APPEARANCES OF COUNSEL

*Ernest J. Williams (Cahill Gordon & Reindel [William E. Hegarty, Thomas J. Kavaler, Vincent E. Gentile* and *Lisa Schilit]* of counsel), for appellant.

*Abbott & Bushlow, P. C. (Bruce E. Bushlow* and *Richard Cary Spivak* of counsel), for respondent.

OPINION OF THE COURT

O'CONNOR, J.

 This is an action to recover damages for personal injuries allegedly sustained by plaintiff in a fall down a staircase in her apartment building during an interruption of electric power service to more than 3,000,000 households in New York City and Westchester County on the evening of July 13, 1977. Plaintiff avers that defendant Con Edison Company of New York, Inc.'s (hereinafter Con Ed) gross negligence in permitting the blackout, which resulted in the sudden darkening of the stairway she was ascending, caused her accident. As in *Goldstein v Consolidated Edison Co.* (93 AD2d 589), plaintiff moved for partial summary judgment to preclude Con Ed from litigating the issue of its gross negligence on the basis of collateral estoppel arising from an earlier judgment against it in *Food Pageant v Consolidated Edison Co.* (54 NY2d 167). I agree with the decision of the majority in *Goldstein (supra)* that plaintiff was entitled to such offensive use of the *Food Pageant (supra)* decision in order to preclude defendant from relitigating this issue.

In *Food Pageant (supra)* a jury awarded a grocery chain $40,500 in damages for food spoilage and lost business. The verdict was upheld on appeal despite Con Ed's arguments that (1) there had been no evidence of gross negligence, (2) there had been no expert testimony on the negligence

issue, as part of plaintiff's case, and (3) the verdict asked of the jury was a general one.

Plaintiff argued in her moving papers that *Food Pageant* (*supra*) was dispositive on the issue of Con Ed's gross negligence in causing the blackout. In opposing plaintiff's motion, Con Ed made the following points: (1) more than 550 actions had been commenced against it to recover damages allegedly sustained as a consequence of the blackout, and of these 380 were still pending, claiming in the aggregate more than $200,000,000 in damages; (2) plaintiffs in some of these cases were moving for partial summary judgment on the gross negligence issue following the result in *Food Pageant* (*supra*); (3) the jury in *Food Pageant* (*supra*) awarded $40,500 in damages despite Food Pageant's argument on summation that it had limited itself in its *ad damnum* clause to $75,000 but had nevertheless proved $38,000 in food spoilage and $43,000 in lost business for a total of $81,000 in damages, or precisely twice the amount awarded; (4) except for *Food Pageant* (*supra*), all decisions on the issue of Con Ed's gross negligence in the blackout had been decided in its favor; (5) Con Ed was publicly blamed by New York City officials for the blackout, and one news article reported that the borough president of the Borough of Manhattan had commenced the first action against it, seeking $1,000,000,000 in damages; and (6) a number of "independent investigative reports" were prepared following the blackout, including one by a special consultant appointed by the Public Service Commission at the Governor's request and another by a staff task force of the Department of Public Service.

In reply, plaintiff pointed out that the decisions in Con Ed's favor were made in the Small Claims Part of the Civil Court of the City of New York, that the contention that the jury in *Food Pageant* (*supra*) arrived at a compromise verdict was sheer speculation, and that Con Ed made no argument that it had newly discovered evidence that would impeach the verdict in *Food Pageant* (*supra*).

Special Term granted plaintiff's motion to the extent it sought to preclude relitigation of the issue of Con Ed's gross negligence in causing the blackout, but held that

there were questions of fact, *inter alia,* as to whether Con Ed owed a duty of care to plaintiff.

On appeal, Con Ed reiterates the arguments that there were inconsistent prior determinations and a compromise verdict in *Food Pageant* (*supra*), and raises several new arguments, namely: (1) that the issue of Con Ed's gross negligence cannot be determined apart from plaintiff's alleged negligence, therefore the issues in the case at bar are not identical to the issues in *Food Pageant* (*supra*), (2) that Con Ed's incentive to fully litigate in *Food Pageant* (*supra*) was moderated by the size, absolute, and relative to outstanding aggregate claims, of the damages claimed in that case, (3) that "[t]he public at large, as rate-payers, will ultimately absorb the cost of any damage awards assessed against" defendant, and (4) that the official investigative reports which concluded that the blackout resulted from causes inconsistent with gross negligence on Con Ed's part, had not been placed before the jury in the *Food Pageant* case. It is Con Ed's position that these factors take this case out of the rule laid down by the Court of Appeals in *Schwartz v Public Administrator of County of Bronx* (24 NY2d 65, 71): "Although we have not previously said so, it is now evident that New York has adopted the full and fair opportunity test in applying the doctrine of collateral estoppel. (*Zdanok* v. *Glidden Co.,* 327 F.2d 944, 956 [2d Cir., FRIENDLY, J.], cert. den. 377 U.S. 934; *Graves* v. *Associated Transp.,* 344 F.2d 894, 900 [4th Cir.]; *Teitelbaum Furs* v. *Dominion Ins. Co.,* 58 Cal. 2d 601 [following through on Chief Justice (then Justice) TRAYNOR's seminal decision in *Bernhard* v. *Bank of America,* 19 Cal. 2d 807]; *Ordway* v. *White,* 14 A D 2d 498, 500-501 [HALPERN, J., concurring], *supra;* see, also, Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan. L. Rev. 281; Currie, Civil Procedure: The Tempest Brews, 53 Calif. L. Rev. 25, 31; Polasky, Collateral Estoppel — Effects of Prior Litigation, 39 Iowa L. Rev. 217, 250.) New York law has now reached the point where there are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a

full and fair opportunity to contest the decision now said to be controlling."

Among the elements to be considered in determining if there has been a full and fair opportunity to contest the decision, i.e., "whether a party has had his day in court", are "such considerations as the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation" (*Schwartz v Public Administrator of County of Bronx, supra,* p 72).

Con Ed argues not only that plaintiff has failed to meet the *Schwartz* test for identity of issue and for a full and fair opportunity to previously litigate the issue, but also that such preclusive effect would deprive it of its constitutional right to due process of the law because the adversarial system is inescapably flawed (citing *Parklane Hosiery Co. v Shore,* 439 US 322; *Blonder-Tongue v University Foundation,* 402 US 313). These arguments are without merit.

■ As to the question of the identity of the gross negligence issue in both *Food Pageant* (*supra*) and the case at bar, it is obvious that Con Ed's gross negligence was not causally interrelated with culpable conduct on the part of plaintiff in either of these cases. Therefore, the issue resolved in *Food Pageant* (*supra*) was a *discrete* one and, having been resolved against Con Ed in that case, the factual determination may be used against Con Ed in the case at bar if the second prong of the *Schwartz* test has been met. As to that "full and fair opportunity" prong of the test, Con Ed essentially makes two arguments: (1) that the *Food Pageant* determination is intrinsically suspect because of certain "indications of a compromise verdict" and (2) that that determination is extrinsically suspect because of the existence of inconsistent judgments and exculpatory investigation reports.

■ As to the compromise verdict argument, Special Term properly characterized it as "mere speculation". Apart from the obvious fact that the award of $40,500 in *Food Pageant* (*supra*) was exactly one half the amount of damages allegedly proved, Con Ed failed even to suggest a

reason for a jury's discounting by half this total sum, nor attempted to rebut plaintiff's point that the damages were roughly attributable half to inventory losses and half to the less easily ascertainable loss of business. More significantly, however, Con Ed did not raise this issue on its appeal from the judgment in *Food Pageant* (*supra*); its belated collateral attack is therefore unpersuasive.

As to the extrinsically suspect nature of the *Food Pageant* decision, Con Ed argues, dehors the record, that exculpatory material in the "authoritative" reports (e.g., its inability to raise new capital for systems improvements) was ruled inadmissible during the *Food Pageant* trial. Again, of course, this alleged error was cognizable upon appeal and, not having been pressed on direct appeal from the judgment, is entirely unpersuasive in what would amount to collateral review here. Nor would the hearsay conclusion of these reports, no matter how "authoritative", be competent as evidence, whether newly discovered or otherwise.

The main thrust of Con Ed's appeal, however, is the fundamental unfairness of being caught in the multiple claimant anomaly described in *Parklane Hosiery Co. v Shore* (439 US 322, 330, n 14, *supra*), in that its defeat for a mere $40,500 in *Food Pageant* (*supra*) has exposed it to the catastrophic liability of more than $200,000,000.

■ Under the test in *Schwartz* (*supra*) the size of the claim is relevant to whether a party has had a full and fair opportunity to litigate. It obviously relates to the party's *incentive* to litigate. Thus, in *Berner v British Commonwealth Pacific Airlines* (346 F2d 532, cert den 382 US 983), an unappealed $35,000 wrongful death judgment was held not to preclude defendant from litigating a subsequent $7,000,000 wrongful death action. The court reasoned that defendant had insufficient incentive to litigate (and appeal) the earlier judgment in light of the fact that, at the time, offensive use of collateral estoppel was not permitted, absent mutuality. Certainly the history of the litigation, including appeals, in the *Food Pageant* case belies any argument that the relatively small exposure there lulled Con Ed into a false sense of its importance for collateral

estoppel purposes in future litigation arising from the blackout.

Con Ed's attack, however, is based not only on *application* of the *Schwartz* criterion for a full and fair opportunity to litigate, but on its holding that "there are but *two* necessary requirements for the invocation of the doctrine of collateral estoppel", namely, identity of issue and a full and fair opportunity to litigate (24 NY2d 65, 71; emphasis supplied). In effect, Con Ed complains that a fair trial is not sufficient if its outcome is inconsistent with the outcome of another fair trial.

Con Ed relies on dictum of the United States Supreme Court: "Allowing offensive collateral estoppel may * * * be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant" (*Parklane Hosiery Co. v Shore,* 439 US 322, 330, *supra*). Defendant points out that it is in the same position as the railroad in Professor Currie's railroad collision example (*Parklane Hosiery Co. v Shore, supra,* p 330, n 14, citing Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan L Rev 281). In that familiar illustration of the multiple claimant anomaly, a single accident — a railroad collision — injures 50 persons, and the railroad is subjected to a series of actions, winning the first 25 but losing the 26th. Currie argued that it would be absurd to permit the remaining parties to preclude the railroad from relitigating its culpability established in the 26th case, which he characterized as an aberration in light of the results in the first 25.

The difficulty with this position, of course, is that it would undermine the principle of finality in litigation to permit a litigant to escape the fact-finding process of a fair trial. As stated by the Supreme Court of Oregon in *State Farm Fire & Cas. Co. v Century Home Components* (275 Ore 97, 106-107): "There is no foundation in either experience or policy for accepting the suggestion that a decision rendered after a full and fair presentation of the evidence and issues should be considered either substantially suspect or infected with variables indicating the question might be decided differently in another go-round. Currie

subsequently conceded the untenability of his initial position and retreated from it, stating that "* * * so long as we retain sufficient faith in the institution of trial by jury to retain it for civil cases at all, what warrant is there for mistrusting the verdict for purposes of collateral estoppel when there is no suggestion that there has been compromise or other impropriety?" Currie, *Civil Procedure: The Tempest Brews,* 53 Calif L Rev 25, 36 (1965)."

As the Supreme Court of the United States put it when it breached the mutuality citadel in a case involving patents (*Blonder-Tongue v University Foundation,* 402 US 313, 328-329, *supra*): "The broader question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue. The question in these terms includes as part of the calculus the effect on judicial administration, but it also encompasses the concern exemplified by Bentham's reference to the gaming table in his attack on the principle of mutuality of estoppel. In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources."

While conceding that the jury trial is less an engine for the scientific ascertainment of ultimate truth than a mechanism for finally resolving disputes between citizens, the Supreme Court of Oregon anticipated the United States Supreme Court's concern in *Parklane Hosiery Co. v Shore* (*supra*), by remarking that "we are not free to disregard incongruous results when they are looking us in the eye" (*State Farm Fire & Cas. Co. v Century Home Components,* 275 Ore 97, 108, *supra*). The gist of its complaint is expressed in Comment *g* to section 29 of the Restatement of Judgments, Second: "[T]aking the prior determination at face value for purposes of the second action would *extend the effects of imperfections in the adjudicative process* beyond the limits of the first adjudication, within which they are accepted only because of the practical necessity of achieving finality" (emphasis supplied; see, also, Restatement, Judgments 2d, § 29, Comment *f*).

Furthermore, according to *Parklane Hosiery Co. v Shore* (439 US 322, 329-330, *supra*), "offensive use of collateral

estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries.' * * * Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment * * * Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action".

There are three replies to these arguments against offensive use of collateral estoppel in so-called multiple claimant anomalies such as the one presented for resolution here.

█ In the first place, resurrection of the mutuality of estoppel rule in a multiple claimant situation where there have been inconsistent results cannot possibly restore public confidence in the integrity of the jury trial system. The possibility of inconsistent results is forever present: it is inherent in the adversarial system. Once the inconsistency appears, it cannot be made to disappear by permitting further litigation of the facts in dispute. The unanalyzed assumption in Currie's railroad illustration is that the *minority* result (in which the defendant lost after a string of 25 victories) is the *aberrational* result — in short, *it* is (or may be perceived to be) the *erroneous* fact finding. This conclusion is neither logical nor wise.

It is intuitively obvious that, of an infinite number of trials of the disputed issue, at least one would be at variance with the rest. A measure of confidence would attach to the conclusion that the minority of one was an erroneous fact finding. Assuming it were possible to take a *statistically valid* sample of these trials, a reasonable measure of confidence would attach to the conclusion that if the

deviant decisions represented a sufficiently small minority, such would demonstrate that the majority decisions represented the more accurate fact finding. Possibly an inconsequential degree of error would be introduced into this process if, as a cost-cutting measure, the initial trial was video taped and subsequent trials were limited to playing back the tape to different juries. Yet would anyone seriously suggest that the definition of a fair trial be expanded to incorporate such a process in order to improve its *accuracy*? Obviously, accuracy has its costs. In a very real sense, litigants are entitled to only that justice which society is prepared to pay for, and that justice is a single fair trial.[1]

In the second place, the practical consequences of the distinction between offensive and defensive use of collateral estoppel are more seeming than real. In *Parklane Hosiery Co. v Shore* (439 US 322, *supra*), the Supreme Court suggested that defensive use is fair and efficient because it encourages a plaintiff to join all defendants in a single trial lest he be estopped from litigating his claim against other defendants. In apparent contrast, said the court, offensive use creates a holdout situation: defendant is confronted with a war of attrition, fending off one challenger after another, until one perseveres and the remainder then invoke collateral estoppel in order to share in the victory without having incurred the costs of severally or jointly litigating the dispositive issue.

There is, however, no inherent unfairness or inefficiency in permitting both offensive and defensive use of collateral estoppel. It must be remembered that in cases involving personal injury or wrongful death — in which the typical multiple-claimant anomaly arises — parties' rights to their persons are never put in issue, but a property action

---

1. This trade off between accuracy and societal cost is hardly a novel idea. In recognition of the frailty of human endeavors to ascertain truth, it has long been accepted that error can never be wholly banished from any fact-finding process, and that adjustments to the process must eventually give way to modifications that tolerate some types of error in order to reduce less desirable types of error. The most obvious example of this is the centuries-old, and recently revived, debate over the appropriate ratio of wrongful acquittals to wrongful convictions in criminal cases. Fortescue recommended 20 to 1; Hale recommended 5 to 1, and Blackstone 10 to 1. (See Nagel and Neef, Decision Theory and the Legal Process, pp 13, 195, 207-208; Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv L Rev 1329, 1376, 1381-1382, 1391; Kaplan, Decision Theory and the Factfinding Process, 20 Stan L Rev 1065, 1072.)

necessarily calls into question the parties' rights to their property. Litigation, however, vindicates the rights of the parties only if they have been violated at some point in time. Obviously defensive use of collateral estoppel by an alleged tort-feasor, trespasser or infringer against the injured plaintiff is efficient because it precludes the plaintiff from commencing further actions against different defendants after losing the dispositive issue against one defendant. Contrary to the *Parklane Hosiery Co. v Shore (supra)* dictum, however, this efficiency cannot encourage plaintiff in a property action to join all *potential* challengers to his property right in one action for the simple reason that they cannot be made defendants until they have violated his purported right. Thus, by its very nature, the institution of property compels a property owner to stand eternally vigilant against all the world: to do nothing in response to acts of trespass or infringement risks loss of his property by prescription; to litigate against violators risks an adverse decision forever terminating his claim as against all the world. Can it be said that there is some fundamental unfairness in using collateral estoppel against a defendant accused of committing a wrong against many parties in a single event at one point in time — such as in the case at bar — in a society that will collaterally estop a plaintiff from defending his title or patent from trespass or infringement occurring from time to time? Is there a rational difference between being put to the test in action after action because of repeated trespasses against one's property and being put to the test in action after action because of the multitude of persons injured by one's gross negligence on one occasion?

In the third place, the argument that offensive use of collateral estoppel creates a holdout situation overstates the incentive among plaintiffs to wait and see the result of litigation commenced by the first plaintiffs to act. Militating against this incentive is the expense of commencing and prosecuting separate actions and the substantial discouragement created by defendant's initial victories among would-be plaintiffs. This, of course, is particularly significant in the case under review. The issue of gross negligence in the electric power blackout is a highly technical question. Furthermore, as a matter of strategy, Con

Ed was probably well advised to avoid a joint trial of all 550 or so actions commenced against it from among its more than 3,000,000 black-out households. Doubtlessly a significant fraction of the more than $200,000,000 in claims, though large when aggregated, comprised actions that would be litigated in the Small Claims Courts and therefore could not form the basis for collateral estoppel.[2]

Finally, Con Ed fails to suggest a meaningful set of criteria that would clearly distinguish those multiple claimant situations in which offensive use of collateral estoppel has been authorized (see, e.g., *Kowalski v Mohsenin,* 38 AD2d 274; *Randolph v Nurse,* 49 AD2d 354) from those in which it should not be permitted. It may very well be that the Public Service Commission, which regulates the defendant utility as a gas and electric corporation organized under the Transportation Corporations Law, may authorize Con Ed to increase its rates in an attempt to pass on the costs of any judgments to its customers, rather than to charge its shareholders. Nevertheless, there is no reason for this court to resurrect the mutuality requirement in order to preclude use of collateral estoppel against Con Ed in order to protect the rate payers or shareholders from the consequences of Con Ed's gross rather than ordinary negligence.

It is also of some significance that Con Ed nowhere suggests that it attempted to join all pending claims against it for purposes of trial, as was done in the multiple claimant situations in *Appel v Braverman* (NYLJ, Sept. 14, 1970, p 21, col 8), *Sheeran v Sheeran* (NYLJ, Feb. 5, 1973, p 20, col 5), and *Ames v Condon* (NYLJ, Aug. 1, 1969, p 10, col 4).

The unresolved problem, of course, is joinder not only of pending actions but also of those actions expected from possible plaintiffs who would otherwise wait and see the results of initial litigation before commencing their own actions. Only a plaintiff can request that an action be

---

**2.** CCA 1808, which is typical of the various small claims provisions in the local court acts, proscribes use of small claims judgments for collateral estoppel purposes: "A judgment obtained under this article may be pleaded as res judicata only as to the amount involved in the particular action and shall not otherwise be deemed an adjudication of any fact at issue or found therein in any other action or court." The apparent necessity of this provision arises from the informal nature of the small claims trial procedure (CCA 1804).

prosecuted as a class action under CPLR 902. Under CPLR 602 the Supreme Court is empowered to direct joint trials only of pending actions involving a common question of law or fact. There is no express authorization in any of the practice acts for any court of this State to stay pending actions, compel commencement of all related actions, and direct their joint trial. Nevertheless, as stated in subdivision 3 of section 2-b of the Judiciary Law, a court of record has power "to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it". Pursuant to its equity powers, a court may entertain a plenary action to enjoin all pending and prospective claimants from proceeding to trial and to direct a joint trial of such claims under a liberal interpretation of the process known as a bill of peace (see, e.g., *Board of Supervisors v Deyoe,* 77 NY 219; cf. *Dresdner v Goldman Sachs Trading Corp.,* 240 App Div 242; see, also, *Indestructible Metal Prods. Co. v Summergrade,* 197 App Div 199).

For these reasons, and those stated in the majority opinion in *Goldstein v Consolidated Edison Co.* (93 AD2d 589, *supra*), I conclude that Special Term properly precluded Con Ed from relitigating the issue of its gross negligence in the 1977 blackout. Accordingly, Special Term's resettled order should be affirmed insofar as appealed from.

GIBBONS, J. (concurring). The question before this court is whether defendant Consolidated Edison Company of New York, Inc. (hereinafter Con Ed) should be precluded from litigating in this case the discrete issue of whether the July 13, 1977 electrical blackout, which occurred in New York City, was caused by its gross negligence, an issue which was decided adversely to it in the case of *Food Pageant v Consolidated Edison Co.* (54 NY2d 167). We must decide whether Con Ed should be collaterally estopped from relitigating this issue. I agree with my colleagues, Justices O'CONNOR and BOYERS, and with the majority in the case from the Appellate Division, First Department, *Goldstein v Consolidated Edison Co.* (93 AD2d 589), that collateral estoppel should be applied. I

voice a separate concurrence in order to highlight certain aspects of the controversy.

For an estoppel to attach to the question of gross negligence, that issue must be identical in this case and in the prior proceeding, it must have necessarily been decided in the prior proceeding, and defendant must have had a full and fair opportunity to litigate the issue in the prior proceeding (*Gilberg v Barbieri,* 53 NY2d 285, 291). Furthermore, the doctrine of collateral estoppel should never be applied mechanically. A case-by-case approach is necessary, keeping in mind the doctrine's underlying policy considerations of conserving the resources of courts and litigants, promoting the finality of judgments, and insuring fairness to all parties (see *Gilberg v Barbieri, supra,* p 291; *Read v Sacco,* 49 AD2d 471, 473).

My colleagues find, and I agree, that the issue of Con Ed's gross negligence is identical in both this case and in *Food Pageant* (*supra*), and that such was necessarily decided in the *Food Pageant* action. The dissent concludes, however, that estoppel should not be applied because defendant has met its burden of showing that it did not have a full and fair opportunity to litigate the issue of the *Food Pageant* case, and/or the policy considerations underlying the doctrine of issue preclusion would not be furthered by applying it here. I disagree.

The Court of Appeals has listed some of the factors which should be examined in determining whether a party has had a full and fair opportunity to litigate an issue. "[T]he size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation" are all aspects to be considered (*Schwartz v Public Administrator of County of Bronx,* 24 NY2d 65, 72). The dissent correctly points out that most of these factors, when applied here, tend to a conclusion that Con Ed did have a full and fair opportunity in the *Food Pageant* case to litigate the issue of gross negligence. That case was litigated from the Supreme Court, Bronx County, all the way to the Court of Appeals. The firm which represented defendant in *Food*

*Pageant* (*supra*) was the same as in this case and includes some very distinguished and able attorneys. The scope of that litigation, if not the size of the damages, displays a great deal of initiative on defendant's part. The existence of a compromise verdict is mere conjecture on defendant's part, and there are no significant differences in applicable law. The existence of other litigation arising from the blackout has always been more than a possibility; it is an actuality. It can scarcely be said that counsel for defendant was unaware, during the *Food Pageant* case, of potential ramifications of losing that action.

Despite all of the above, the dissent concludes that the size of the *Food Pageant* verdict, relative to the size of the remaining claims, and so-called new evidence "weighs heavily in favor of refusing to treat *Food Pageant* (*supra*) as conclusive on the gross negligence issue". It is true that the $75,000 claim in *Food Pageant* (*supra*) is small relative to the aggregate damages of over $200,000,000, claimed in more than 380 actions which Con Ed says are still pending against it as a result of the 1977 blackout. However, in and of itself, $75,000 is not a meager sum. As Justice THOMPSON states in his dissent with respect to the amount of the claim in *Food Pageant* (*supra*), "[t]here is nothing in the record to cast doubt upon a conclusion that Con Ed defended the *Food Pageant* action to the best of its ability and with an appreciation of the close scrutiny of the case by the numerous other plaintiffs with pending actions generated by the blackout".

Apparently, the amount of damages sought in *Food Pageant* (*supra*) is regarded by the dissent as not weighing on whether defendant fully litigated that case. Rather the view seems to be that it is unfair for a defendant in a multisuit situation to have to defend each action, no matter how small the damages involved, to the fullest of its ability in order to avoid collateral estoppel consequences. Why is this unfair? As the dissent notes, a victory for the defendant in one such matter, fully and fairly litigated, may provide the defendant with a strong argument for avoiding issue preclusion in further cases, because of the factor of inconsistency (see *Vincent v Thompson,* 79 Misc 2d 1029, 1044-1045, revd on other grounds 50 AD2d 211).

Furthermore, the contention of unfairness, if upheld, would effectively result in collateral estoppel never being applied in multiple suit situations where the suits, in and of themselves, were fairly small in size, but in the aggregate constituted claims for a large sum of money. Given the policies behind the doctrine of issue preclusion, this is certainly not a desirable result (see *Vincent v Thompson, supra,* p 1045; *Hart v American Airlines,* 61 Misc 2d 41).

It is thus apparent that the size of the claim in *Food Pageant (supra)* is not such as to lead one to conclude that Con Ed did not have a full and fair opportunity to litigate the issue of gross negligence in that case, nor is it a factor upon which to base an argument that issue preclusion in this case would be otherwise unfair. I now turn my attention to the contention that Con Ed has new evidence which was not presented in the *Food Pageant* case.

It is true that the discovery of significant new evidence after a judicial determination may make collateral estoppel inappropriate (*Vincent v Thompson,* 50 AD2d 211, 221, *supra*). Defendant contends that certain investigative reports, which were not before the jury in *Food Pageant (supra)*, strongly suggest that it was not grossly negligent. However, these reports are not newly discovered. In fact, they were all in existence by early 1978 and were a part of the evidence in the case of *Lee v Consolidated Edison Co.* (95 Misc 2d 120, revd 98 Misc 2d 304), which was decided on June 1, 1978. The *Food Pageant* case was tried from April 27 to May 9, 1979.

It is contended that Con Ed was prevented from presenting these reports during the *Food Pageant* trial. However, defendant has not shown this court any portion of the record of that trial which indicates that it offered any of these reports into evidence or even mentioned them to the Trial Judge. Significantly, the Court of Appeals in its decision in *Food Pageant* (54 NY2d 167, *supra*) did not mention any appellate issue concerning these reports.

It is, at least, arguable that important evidence which is improperly excluded in a prior case militates against estoppel attaching to issues in that case, even where the judgment therein is not appealed. However, where the evidence in question was possessed by the opponent of

issue preclusion at the time of the prior case, and no attempt was made to have that evidence admitted, it makes no sense at all to say that that party, in this case Con Ed, was thereby not afforded a full and fair opportunity to litigate. Moreover, the policies of promoting fairness for all parties and of promoting judicial efficiency are hardly furthered by encouraging litigants to keep some evidence from the fact finder in the first case so that, if there is an adverse verdict, this "new" evidence can magically appear to prevent collateral estoppel.

Defendant's primary argument in opposition to issue preclusion, which is accepted by my colleagues in the dissent, is that applying collateral estoppel would be unfair because there exist several previous judgments in cases stemming from the blackout which are in its favor. As a general proposition, there does seem to be "something fundamentally offensive about depriving a party of the opportunity to litigate the issue again when he has shown beyond a doubt that on another day he prevailed" (*State Farm Fire & Cas. Co. v Century Home Components,* 275 Ore 97, 110). If, in one case, the fact finder holds, for example, that a defendant was not negligent and then, in a subsequent case, involving another plaintiff, the fact finder concludes that the defendant was negligent, why then, other things being equal, should the courts give more credence to the letter verdict so as to estop further litigation of the negligence issue?

While not quarreling with the general proposition, I do not believe it applies here. The fact is other things are not equal and there is every reason to give more credence to the *Food Pageant* verdict than to other cases in which Con Ed emerged the victor. Each one of these other cases was a small claims action. The two reported cases, *Lee v Consolidated Edison Co.* (95 Misc 2d 120, *supra*) and *Lo Vico v Consolidated Edison Co.* (99 Misc 2d 897), reveal that the plaintiffs were *pro se,* although *amicus curiae* briefs were filed, apparently, with respect to certain legal issues. On the other side, Con Ed was represented by the same law firm appearing in this case. In *Food Pageant (supra)* the plaintiff was represented by counsel. A victory against an opponent who lacks expert legal advice, particularly with

respect to presentation of key evidence which it is his burden to present, is not very noteworthy, whatever the forum. One can only wonder whether the plaintiffs in the small claims actions referred to by Con Ed were capable of presenting evidence of any quality or quantity on a subject as complex as the degree of Con Ed's responsibility for the blackout.

The fact that these other determinations were in Small Claims Court is fatal to defendant's argument. "By statute collateral estoppel effect is denied to * * * determinations in small claims actions (see section 1808 of the Uniform City Court Act, Uniform Justice Court Act and New York City Civil Court Act). Even in the absence of statute, however, these minor suits are illustrative of the type of determination which, under accepted common-law principles, should not be held conclusive in later cases (see, e.g., Restatement, Judgments 2d [Tent Draft No. 4], § 68.1, subd [c], and Comment *d*)" (*Gilberg v Barbieri,* 53 NY2d 285, 293, *supra*). If small claims determinations are so lightly regarded as not to be accorded collateral estoppel effect, why then should they be accorded the equivalent status and respect given a contrary determination of the Supreme Court, which has been appealed to the highest court in the State, so as to prevent the latter from serving as a basis for issue preclusion? A judicial determination is given collateral estoppel effect because, among other things, we are reasonably certain of its correctness. Such certainty is not dispelled just because the opponent of issue preclusion can point to a contrary determination of such questionable value that, as a matter of law, it may not be considered credible enough to bind a party in a subsequent action.

The dissent maintains that it is unfair to let "[a] plaintiff with a substantial claim * * * to sit back and wait for a smaller case to proceed with the expectation that the defendant prevailing in the small case can be ignored because the plaintiff with the lesser claim lacked the ability to try the case to the fullest, yet if the defendant loses, collateral estoppel will apply because of the defendant's knowledge of the pendency of the larger claim". That would be unfair and is, perhaps, one of the reasons

that collateral estoppel is, in fact, not applied in small claims actions. If defendant had lost in the small claims actions it refers to, it would still have had the right to litigate the issue of gross negligence in the subsequent *Food Pageant* case.

The dissent's unfairness argument can be refuted by examining the alternative. It would be very unfair to allow a defendant, such as Con Ed in this case, to forever avoid the possibility of collateral estoppel in a multiple case situation just because it was able to win one or two minor cases in the Small Claims Court which, naturally enough, came to trial before any substantial case was heard in the Supreme Court. If defendant's view is accepted, a $50 *pro se* suit by Jane Doe, brought because the plaintiff's meat spoiled during the blackout, which is won by Con Ed because Jane Doe is, of course, no match for the counsel and experts commanded by Con Ed, must lead us to conclude that a subsequent verdict in Supreme Court against Con Ed for many thousands of dollars is of such doubtful validity that it may not result in issue preclusion.

It may be appropriate in another case, wherein some factors are present suggesting that the opponent of issue preclusion lacked a full and fair opportunity to previously litigate the issue in question, that the existence of inconsistent determinations, as exist here, should be accorded some weight, perhaps even to the extent of tipping the scales against issue preclusion. However, this is not such a case. As already seen, defendant has not, in any respect, persuasively argued that it did not have a full and fair opportunity in the *Food Pageant* case to litigate the question of its responsibility for the blackout.

There is one further aspect of this case which deserves comment. It is proposed that the offensive use of collateral estoppel should not be encouraged, in that, rather than promoting judicial economy, it has the effect of giving plaintiffs an incentive not to join in one action but to wait to see what happens in other actions (see *Parklane Hosiery Co. v Shore,* 439 US 322, 329-330). While, in some situations that might be true, it is no reason to absolutely prohibit the offensive use of collateral estoppel. Both the United States Supreme Court and our Court of Appeals

have allowed plaintiffs to affirmatively use earlier judgments as conclusively deciding issues against opposing defendants (see *Parklane Hosiery Co. v Shore, supra; B. R. DeWitt, Inc. v Hall,* 19 NY2d 141). In any event, there should be no apprehension about allowing a plaintiff the benefit of collateral estoppel when his action is such that it could not easily be joined with other actions arising from the same incident (see *Parklane Hosiery Co. v Shore, supra,* p 331). Such is the situation here. The cases arising out of the 1977 blackout are simply too varied, particularly with respect to issues of causation and contributory negligence, to allow for joinder of any significant number of them.

In sum, then, the resettled order of Special Term should be affirmed insofar as appealed from. The finding by the jury in *Food Pageant* (*supra*) that Con Ed's gross negligence caused the 1977 blackout should be given conclusive effect so as to preclude further litigation of that issue in this case.

THOMPSON, J. (dissenting). On July 13, 1977, Consolidated Edison Company of New York, Inc.'s (hereinafter Con Ed) electric power system failed, leaving approximately 3,000,000 households in New York City and Westchester County in the dark. As a consequence of the blackout, more than 550 actions seeking in excess of $200,000,000 were instituted. In the case of *Food Pageant v Consolidated Edison Co.* (54 NY2d 167), an action initiated by a grocery store chain to recover for food spoilage and lost business, the jury returned a verdict on May 9, 1979 in favor of the plaintiff in the amount of $40,500 upon a finding that Con Ed's gross negligence[1] had caused the power failure. The judgment entered upon the verdict was affirmed by the Appellate Division, First Department (78 AD2d 1016), and on November 19, 1981 the Court of Appeals concluded that the record on appeal adequately supported the jury's finding of gross negligence (54 NY2d 167, *supra*). The issue presented by the instant appeal concerns the collateral estoppel effect of the *Food Pageant* decision upon a separate pending action arising out of the blackout.

---

1. Con Ed's rate schedule on file with the Public Service Commission provides that it is not liable for service interruptions resulting from ordinary negligence.

## I

Plaintiff Sadie Shaid initiated the instant action on December 7, 1977 to recover for the personal injuries she suffered as a result of Con Ed's alleged gross negligence. She claimed that when the blackout occurred she became startled and disoriented, and this caused her to fall down a stairway at her residence and suffer severe injuries. By notice of motion dated January 20, 1982, Shaid moved for summary judgment on the issue of Con Ed's liability, and included a request that at a minimum Con Ed be collaterally estopped from contesting the issue of its gross negligence as the proximate cause of the power failure. Shaid's attorney argued in support of the motion that the *Food Pageant* decision should prevent Con Ed from being afforded an opportunity to relitigate the issue of its gross negligence, and applying collateral estoppel in this situation would assist in diminishing the tremendous litigation backlog that exists by providing an efficient and consistent resolution of what would be a recurring issue. He further argued that Con Ed had a full and fair opportunity to contest the issue of its gross negligence in *Food Pageant* (*supra*), and to introduce into evidence any relevant information in its possession as to the cause of the blackout. He contended that under the classic standard for invoking the doctrine of collateral estoppel set forth in *Schwartz v Public Administrator of County of Bronx* (24 NY2d 65) Con Ed should be estopped from contesting the issue of its gross negligence.

In opposition to the motion, Con Ed posited several arguments. It noted that prior actions instituted against it had resulted in determinations that it had not been grossly negligent with regard to the power failure. In addition, it contended that the *Food Pageant* decision resulted from a compromise verdict. Furthermore, it asserted that comprehensive independent investigative reports[2] prepared in connection with the reasons for the blackout contained exculpatory material absolving Con Ed of gross negligence.

---

**2.** Clapp, State of New York Investigation of the New York City Blackout July 13, 1977 (Jan., 1978); Staff Task Force, Department of Public Service, Second Report: The Events Leading to the Consolidated Edison Company Blackout of July 13, 1977 (Sept. 15, 1977); see, also, Third Phase Report, System Blackout and System Restoration, July 13-14, 1977 (Dec. 28, 1977).

In light of the foregoing, Con Ed claimed that it would be inequitable to deny it its day in court on Shaid's claim with respect to the question of gross negligence.

Special Term determined that Con Ed should be collaterally estopped from relitigating the issue of its gross negligence. The claim that the *Food Pageant* decision resulted from a compromise verdict was, according to Special Term, "mere speculation". Special Term held that the prior decisions resulting in verdicts in Con Ed's favor were of little consequence because the actions "appear to have been brought, for the most part, in small claims courts and to have been determined with little or no actual litigation of the issue of gross negligence". Furthermore, Special Term concluded that "there is no reason to doubt the quality, extensiveness or fairness of the procedures followed in *Food Pageant* or defendant's full participation and opportunity to be heard therein". Special Term denied plaintiff summary judgment on the issue of liability because of unresolved factual issues concerning plaintiff's contributory negligence and whether the blackout was the proximate cause of the injury. Partial summary judgment was granted pursuant to CPLR 3212 (subd [e]), precluding Con Ed from relitigating the question of its gross negligence as the cause of the blackout.[3] Con Ed has appealed from so much of a resettled order of the Supreme Court, Queens County, dated September 13, 1982, as granted partial summary judgment on the issue in question. For the reasons set forth herein I believe the resettled order should be reversed insofar as appealed from and plaintiff's motion for summary judgment should be denied in its entirety.

## II

In *Schwartz v Public Administrator of County of Bronx* (*supra,* p 71), the Court of Appeals proclaimed: "[T]here are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an identity of

---

**3.** The conclusion reached by Special Term is consistent with that reached by some courts on the same issue (*Russo v Consolidated Edison Co.*, Supreme Ct, App Term, 2d & 11th Jud Dists, Jan. 13, 1983; *Crane v City of New York*, NYLJ, Aug. 9, 1982, p 12, col 6; *Koch v Consolidated Edison Co.*, NYLJ, June 16, 1982, p 6, col 4; *Whitestone Packing Corp. v Consolidated Edison Co.*, NYLJ, Feb. 25, 1982, p 12, col 3). Other courts have refused to apply collateral estoppel in these circumstances (*Howard Stores Corp. v Consolidated Edison Co.*, Supreme Ct, NY County, Jan. 13, 1983, KLEIMAN, J.; *Goldstein v Consolidated Edison Co.*, NYLJ, July 27, 1982, p 10, col 5, mod 93 AD2d 589).

issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling". The court further noted (p 74) that the value of the application of the collateral estoppel doctrine was that it serves to "reduce the number of inconsistent results which are always a blemish on a judicial system * * * [I]n this day of great delays in accident litigation, a single trial of all claims growing out of the same accident will constitute a great savings of judicial manpower and time, without any true unfairness to the parties".

It must be recognized, however, that the advantages of judicial economy, uniformity, and certainty provided by application of the doctrine of collateral estoppel are not to be pursued without regard for the overriding concern of achieving fairness in each individual case. It is for this reason that the doctrine is not rigidly or mechanically applied (*Schwartz v Public Administrator of County of Bronx, supra,* p 73). "Because the doctrine is based on general notions of fairness there are few immutable rules" (*Gilberg v Barbieri,* 53 NY2d 285, 291). Rather, broad discretion exists in the application of the doctrine (see *Parklane Hosiery Co. v Shore,* 439 US 322). "Collateral estoppel involves a policy judgment balancing the interests of an individual litigant against the interests of the administration of justice" (*State Farm Fire & Cas. Co. v Century Home Components,* 275 Ore 97, 105).

### III

Con Ed argues that the first prong of the *Schwartz* test was not satisfied because the issue of gross negligence with regard to the blackout in the instant case is not identical with the question of gross negligence necessarily decided in *Food Pageant (supra)*. New York utilizes the comparative negligence rule (CPLR 1411) and each determination of negligence must focus upon the questions of causation, duty, and comparative fault presented by the facts of each individual case. Thus, the finding of negligence in *Food Pageant (supra)* was made within the context of a very specific situation involving the causation, the duty owed, and the comparative fault of the parties. This is simply not

identical with the same factors as they relate to the Con Ed-Shaid relationship, and so in the absence of the identical issue necessarily decided by the first action, Con Ed argues that collateral estoppel is inapplicable.

In support of its argument, Con Ed places great reliance upon *Shanley v Callanan Inds.* (54 NY2d 52). In that case Shanley and James were involved in a head-on automobile collision. A jury found Shanley to be 100% at fault. Shanley, in a second action, claimed that Callanan Industries, which was not a party in the first action, caused the accident. In rejecting Callanan Industries' claim that Shanley was collaterally estopped from denying that he caused the accident, the court stated (p 56): "Nor can we say * * * that the jury verdict in the first action necessarily precludes a different determination of negligence in a second litigation between different parties based upon a different claim of negligence even though both cases arose as a result of the same accident".

I reject Con Ed's claim with regard to identity of issue as completely devoid of merit. Taken to its logical conclusion, Con Ed's argument would mean that any constituent element of a finding of negligence in a comparative negligence situation could never be given collateral estoppel effect where a second action is commenced by a stranger to the first action. Such a conclusion is not supported by reason or case law. The issue of Con Ed's gross negligence as the cause of the blackout is identical in both *Food Pageant* and the instant case, and this issue was squarely addressed and specifically decided in *Food Pageant* (see, generally, *O'Connor v G&R Packing Co.,* 53 NY2d 278, 280). Any existing contributory negligence in *Food Pageant (supra)* or by Shaid could not in any way have caused the blackout, but would involve only the question of the proximate cause of the injuries of the respective plaintiffs. Con Ed is free to claim and prove that Shaid's own negligence caused her to fall, but there is no rule of law which prevents application of governing collateral estoppel principles in all comparative negligence situations. The Court of Appeals recognized the continuing viability of collateral estoppel in comparative negligence cases when it stated in *Shanley v Callanan Inds. (supra,* p 57): "[I]t is now the rule

that a determination between two parties on the issue of negligence no longer necessarily bars recovery against a stranger to the first action *unless the issue was litigated on the merits in the prior trial*" (emphasis supplied). In *Shanley (supra)*, the second action involved a completely separate theory of causation, never litigated in the first action in anticipation of it being litigated in the second action, and so it is thoroughly distinguishable on its facts from the instant case.

## IV

The second prong of the *Schwartz* standard for applying collateral estoppel requires that the party against whom collateral estoppel is to be applied have a full and fair opportunity to contest the decision now said to be controlling. The Court of Appeals in *Schwartz* went on to more fully define "full and fair opportunity" as follows (24 NY2d 65, 72, *supra*): "A decision whether or not the plaintiff drivers had a full and fair opportunity to establish their nonnegligence in the prior action requires an exploration of the various elements which make up the realities of litigation. A comprehensive list of the various factors which should enter into a determination whether a party has had his day in court would include such considerations as the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation". An additional highly relevant factor which must be explored is whether "[t]he determination relied on as preclusive was itself inconsistent with another determination of the same issue" (Restatement, Judgments 2d, § 29, subd [4]; *Parklane Hosiery Co. v Shore, supra*, p 330; *Zdanok v Glidden Co.*, 327 F2d 944, 955, cert den 377 US 934; *State Farm Fire & Cas. Co. v Century Home Components*, 275 Ore 97, *supra*). The party asserting the lack of a full and fair opportunity to contest an issue carries the burden of establishing this claim (*Schwartz v Public Administrator of County of Bronx, supra*, p 73).

## A.

Within the foregoing context, several of the factors to be weighed may be quickly disposed of. There is no assertion

that the forum of the *Food Pageant* decision is a concern in this case, or that differences in applicable law have any relevance to the instant claim. It is also clear that Con Ed was represented by competent and experienced counsel in *Food Pageant* (*supra*).

### B.

Three somewhat related factors involve the extent of the initial litigation now claimed to be preclusive, the size of the claim in the first action, and the foreseeability of future litigation. In a situation where a defendant in the first action is sued for a nominal amount or fails to perceive the potential for future litigation and so assigns little significance to the outcome of the first action, courts may refuse to grant collateral estoppel effect against the same defendant in a subsequent action (*Parklane Hosiery Co. v Shore, supra,* p 330; *Gilberg v Barbieri, supra,* pp 293-294). Similarly, there is a hesitancy to afford collateral estoppel effect to the first action where the amount at issue is dramatically less than that at stake in the subsequent action (see Restatement, Judgments 2d, § 28, subd [5], par [c]; Comment *j; Berner v British Commonwealth Pacific Airlines,* 346 F2d 532, cert den 382 US 983). The underlying assumption is that it is fair to preclude a defendant from relitigating the same issue only when that defendant defended the first action with complete vigor and a full appreciation of the consequences of losing the action.

There is nothing in the record to cast doubt upon a conclusion that Con Ed defended the *Food Pageant* action to the best of its ability and with an appreciation of the close scrutiny of the case by the numerous other plaintiffs with pending actions generated by the blackout. Thus, in this instance, these factors seem to militate against Con Ed's position. Despite this, there is an unsettling aspect to the foregoing. Under *Schwartz* (*supra*) we must be cognizant of the realities of litigation. One of the realities is the spiraling and potentially prohibitive costs of defending a lawsuit. *Food Pageant* (*supra*) involved a $75,000 *ad damnum* claim and proof allegedly establishing $81,000 of damages. Con Ed vigorously contested plaintiff's claim in *Food Pageant* (*supra*) all the way through the Court of Appeals. It is not inconceivable that legal costs incurred by

Con Ed approached or exceeded the amount of plaintiff's claim. It may be argued that Con Ed incurred such costs because it appreciated the profound impact *Food Pageant* (*supra*) could have on the pending claims involving many millions of dollars, but this does not resolve this unsettling aspect of the case. Had Con Ed prevailed in *Food Pageant* (*supra*) upon a finding by the Court of Appeals that gross negligence had not been proven, it would have spent all its money to win that single case. The next plaintiff waiting his turn, having never been afforded his day in court, would still be free to try and prove that Con Ed's gross negligence caused the blackout (*Parklane Hosiery Co. v Shore, supra,* p 327, n 7; *Gramatan Home Investors Corp. v Lopez,* 46 NY2d 481, 485-486; *Gilberg v Barbieri, supra,* p 291). Thus the fact that future litigation is foreseeable does not mean that a defendant should feel compelled to defend each claim, regardless of its size, to the fullest extent possible at the risk of eventually losing a case and suffering far-reaching collateral estoppel consequences as a result thereof. It must be recognized, however, that if a defendant does defend the first action with vigor and prevails, that defendant will have a significant argument against the subsequent application of collateral estoppel, should the issue arise, based on the factor of inconsistency (to be discussed, *infra*).

## C.

A reason for refusing to afford collateral estoppel effect to a prior judgment is provided when the initial determination is based on a compromise verdict (Restatement, Judgments 2d, § 29, subd [5]; *Taylor v Hawkinson,* 47 Cal 2d 893; *Katz v Lilly & Co.,* 84 FRD 378). The rationale for this is set forth in Comment *g* to section 29 of the Restatement of Judgments, Second: "Particularly where the issues have been tried to a jury, the circumstances may suggest that the issue was resolved by compromise or with more or less conscious reference to such matters as insurance coverage or the litigants' relative financial position. In these and similar situations, taking the prior determination at face value for purposes of the second action would extend the effects of imperfections in the adjudicative process beyond the limits of the first adjudication, within which they are

accepted only because of the practical necessity of achieving finality".

Con Ed argues that *Food Pageant* (*supra*) was a compromise verdict. Plaintiff therein sought to prove $81,000 in damages, consisting of $38,000 in food spoilage and $43,000 of lost profits. The jury awarded $40,500, exactly half of this amount.

This argument is without merit. Although the record fails to indicate the basis for the damages awarded in *Food Pageant*,[4] the fact that the award was exactly half of the amount allegedly established provides an insufficient basis for concluding that a compromise verdict was involved. There is no indication that there is any precedent for this "percentage of the damages" assertion, and I agree with Special Term's characterization of Con Ed's position in this regard as "mere speculation".

### D.

The availability of new evidence is an important factor to consider in deciding whether to apply collateral estoppel. The development of new evidence subsequent to the determination now claimed to be controlling, which evidence might have affected the initial determination, militates against giving the first determination collateral estoppel effect (*Vincent v Thompson,* 50 AD2d 211, 221). Con Ed argues that certain investigative reports[5] completed after the blackout contained exculpatory evidence with regard to the issue of its gross negligence in causing the blackout, and that it was prevented from introducing this material into evidence at the *Food Pageant* trial. The record herein supports Con Ed's assertion that the material in the investigative reports may have assisted it in demonstrating the absence of gross negligence, and it is unchallenged on this record that this material was not before the *Food Pageant* jury.

It may be argued that the investigative reports were available prior to the *Food Pageant* trial, and they thus do not constitute newly available evidence. The answer to this is set forth in Comment *j* to section 29 of the Restatement

4. It has been speculated that the jury awarded the full $38,000 for food spoilage and concluded that $2,500 would be fair compensation for lost profits.

5. See n 2, *supra*.

of Judgments, Second, as follows: "Important among such other circumstances is the disclosure that the prior determination was plainly wrong or that new evidence has become available that could likely lead to a different result. It is unnecessary that the party seeking to avoid preclusion show, as he must in seeking to set aside a judgment, that the evidence could not have been discovered with due diligence; the question is not whether a prior determination should be set aside but whether it should be treated as conclusive for further purposes".

Although the foregoing factor provides a basis for refusing to afford *Food Pageant* collateral estoppel effect, troubling questions remain. May a defendant keep certain evidence and defenses applicable to other potential plaintiffs in reserve so that should the first plaintiff prevail, the ensuing judgment will not be useful for collateral estoppel purposes? Was Con Ed required to assert during the *Food Pageant* appeal that the exclusion of the material now sought to be introduced was reversible error? Should Con Ed be required to pursue such an argument on the appeal of a $40,500 verdict when the acceptance of the argument could lead to a new trial and further litigation expenses? Although a basic sense of fairness leads me to believe that evidence should not be held back and that an appeal should be pursued with full forcefulness, I cannot ignore the fact that other evidence does exist, and the question before this court is not whether the evidentiary ruling in *Food Pageant* (*supra*) was correct or whether the *Food Pageant* judgment should be set aside, but whether the *Food Pageant* decision should be deemed conclusive in the instant case. The record herein does not provide a sufficient basis for concluding that Con Ed should be estopped from urging its new evidence argument, and this new evidence weighs heavily in favor of refusing to treat *Food Pageant* (*supra*) as conclusive on the gross negligence issue.

### E.

Collateral estoppel effect will not be given to a determination which is itself inconsistent with a prior determination (Restatement, Judgments 2d, § 29, subd [4]; *State Farm Fire & Cas. Co. v Century Home Components*, 275 Ore 97, *supra*). The rationale for this, as stated in Com-

ment *f* to section 29 of the Restatement of Judgments, Second, is as follows: "Giving a prior determination of an issue conclusive effect in subsequent litigation is justified not merely as avoiding further costs of litigation but also by underlying confidence that the result reached is substantially correct. Where a determination relied on as preclusive is itself inconsistent with some other adjudication of the same issue, that confidence is generally unwarranted. The inference, rather, is that the outcomes may have been based on equally reasonable resolutions of doubt as to the probative strength of the evidence or the appropriate application of a legal rule to the evidence. That such a doubtful determination has been given effect in the action in which it was reached does not require that it be given effect against the party in litigation against another adversary".

The problem of whether collateral estoppel should ever be applied where there are multiple plaintiffs in a single accident, based upon a general skepticism as to the reliability of the initial decision, was thoroughly discussed in *State Farm Fire & Cas. Co. v Century Home Components* (*supra,* pp 105-108), as follows:

"The 'multiple-claimant anomaly' was first hypothesized by Brainerd Currie as one instance where, absent mutuality, the unrestrained application of collateral estoppel might produce unfair results. Currie, *Mutuality of Collateral Estoppel: Limits of the* Bernhard *Doctrine,* 9 Stan L Rev 281 (1957). Currie posed the situation of a train wreck resulting in 50 separate claims being filed against the railroad for negligence. If the defendant railroad won the first 25 cases and subsequently lost the 26th, Currie characterized as an 'absurdity' the notion that the remaining 24 claimants could ride in on the strength of the 26th plaintiff's judgment and estop the defendant on the issue of negligence. The reason was that the 26th judgment would clearly seem to be an aberration. Currie then reasoned that, if we should be unwilling to give preclusive effect to the 26th judgment, we should not afford such effect to an adverse judgment rendered in the *first* action brought because 'we have no warrant for assuming that the aberrational judgment will not come as the first in the series.'

Currie, *supra* at 289. Currie thus concluded that, absent mutuality, collateral estoppel should not be applied where a defendant potentially faces more than two successive actions. Currie, *supra* at 308.

"Those courts which have discarded the rule of mutuality and permit the offensive assertion of collateral estoppel have generally rejected Currie's solution to the multiple-claimant anomaly in situations where the *first* judgment is adverse to the defendant, and have precluded a defendant from relitigating multiple claims where it has been concluded that the defendant had in actuality the incentive and complete opportunity to contest the issue fully in the first action. Currie's reservations were based on the apprehension that the first judgment might well be an aberration, but this view failed to recognize that the very notion of collateral estoppel demands and assumes a certain confidence in the integrity of the end result of our adjudicative process. There is no foundation in either experience or policy for accepting the suggestion that a decision rendered after a full and fair presentation of the evidence and issues should be considered either substantially suspect or infected with variables indicating the question might be decided differently in another go-around. Currie subsequently conceded the untenability of his initial position and retreated from it, stating that

> " '* * * so long as we retain sufficient faith in the institution of trial by jury to retain it for civil cases at all, what warrant is there for mistrusting the verdict for purposes of collateral estoppel when there is no suggestion that there has been compromise or other impropriety?' Currie, *Civil Procedure: The Tempest Brews,* 53 Calif L Rev 25, 36 (1965).

"Thus, once it is accepted that the propriety of collateral estoppel is dependent upon the existence of a prior full and fair opportunity to present a case, there seems little reason to limit its application simply because there are multiple claimants in the picture. Although in our adversary system 'there is always a lingering question whether the party might have succeeded in proving his point if he had only been given a second chance at producing evidence,' *James Talcott, Inc. v. Allahabad Bank, Ltd.,* 444 F2d 451,

463 (5th Cir), *cert. denied,* 404 US 940, 92 S Ct 280, 30 L Ed 2d 253 (1971), the unsubstantiated and conjectural possibility that a party might receive a favorable judgment somewhere down the road is an insufficient reason for refusing to apply collateral estoppel. As we stated in *In re Robert Neil Gygi,* 273 Or 443, 448-49, 541 P2d 1392 (1975),

> " "* * * the prior judgment is treated as conclusive, not because it is actually conclusive evidence of the ultimate truth as to those issues necessarily determined, but because of the public interest in the finality of judgments and in the efficient administration of justice.'

"The deference we lend prior adjudications is based on our reasonable confidence as to their correctness, rather than on a conviction of their unassailable truth. One of the purposes of the doctrine is to protect the authority of judicial decisions, and this purpose would obviously be ill-served by refusing to give effect to a prior determination on the hypothetical possibility of a contrary decision if the case were continuously retried. *See* Hazard, *Res Nova in Res Judicata,* 44 S Cal L Rev 1036, 1041-044 (1971)".

Although rejecting a general rule of refusing to apply collateral estoppel in all multiple claimant anomaly situations, the court concluded that where a prior inconsistent decision did exist (pp 110, 114):

"We agree with the commentators to the extent at least that, where there are extant determinations that are inconsistent on the matter in issue, it is a strong indication that the application of collateral estoppel would work an injustice. There seems to be something fundamentally offensive about depriving a party of the opportunity to litigate the issue again when he has shown beyond a doubt that on another day he prevailed * * *

"We decline the invitation to decide which case was the better tried, in which case the evidence more truly presented the facts, and which 'full and fair opportunity' by defendant resulted in the 'correct' decision. The existence of conflicting determinations of similar issues demonstrates that different bodies can legitimately draw different conclusions. As noted previously, the application of collateral estoppel is a matter of policy, not a quest for certainty". It is important to note that the observations of

the Supreme Court of Oregon were made within the context of a situation where the prior determination in favor of the defendant had not been appealed, whereas the two prior determinations in favor of the plaintiffs had been affirmed on appeal.

Another important element to be weighed within the context of the prior inconsistent determination factor and the multiple plaintiff anomaly situation generally is the somewhat ethereal and esoteric nature of when a preponderance of evidence establishes negligence or gross negligence, and the difference between ordinary and gross negligence. Unlike ordinary negligence, gross negligence involves "the commission or omission of an act or duty owing by one person to a second party which discloses a failure to exercise slight diligence" (*Weld v Postal Tel.-Cable Co.*, 210 NY 59, 72). The difference between ordinary and gross negligence "is oftentimes shadowy and unsatisfactory" (*Dalton v Hamilton Hotel Operating Co.*, 242 NY 481, 487). Furthermore, the judgment in a lawsuit "does not represent an incontrovertible finding of absolute truth, but only reflects a decision as to probabilities" (Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Col L Rev, 1457, 1465). In light of the foregoing, it gives me great pause to think that when a plaintiff carries his burden of proving gross negligence by a 51% preponderance of the evidence and thereafter proves thousands of dollars of damages, the resultant judgment forecloses the defendant from contesting the issue of gross negligence in hundreds of other actions involving hundreds of millions of dollars in alleged damages.

Con Ed points to a number of decisions in which it was found to have been free of gross negligence in causing the blackout (*Lee v Consolidated Edison Co.*, 95 Misc 2d 120; *Penichet v Consolidated Edison Co.*, NYLJ, May 1, 1980, p 7, col 2; *Lehman v Consolidated Edison Co.*, NYLJ, March 25, 1980, p 10, col 6; *Finkelstein v Consolidated Edison Co.*, NYLJ, May 1, 1979, p 13, col 3). I believe that the existence of these decisions, standing alone, provides a sufficient basis for refusing to apply collateral estoppel on the issue of gross negligence in the instant case. The rationales of the Restatement of Judgments, Second, and *State Farm*

*Fire & Cas. Co. v Century Home Components* (*supra*) are fully applicable herein.

It is no answer to say that the prior inconsistent decisions merely arose in a Small Claims Court context. At least some of the decisions were based on a careful analysis of the gross negligence issue, and I have serious reservations as to whether the jurors who decided the *Food Pageant* case appreciated and analyzed the complexities of the gross negligence issue to the same degree as evidenced by Judge ALTMAN's decision in *Lee v Consolidated Edison Co.* (*supra*). As a general proposition, there is also something inherently wrong with the concept that a defendant must try each case to the fullest so that he will avoid serious collateral estoppel consequences for foreseeable future actions, but a series of independent plaintiffs can proceed with whatever minimum effort they wish to expend in establishing their respective claims, and the consequences of a plaintiff losing are unimportant for purposes of invoking the inconsistency ingredient of collateral estoppel. A plaintiff with a substantial claim should not be free to sit back and wait for a smaller case to proceed with the expectation that the defendant prevailing in the small case can be ignored because the plaintiff with the lesser claim lacked the ability to try the case to the fullest, yet if the defendant loses, collateral estoppel will apply because of the defendant's knowledge of the pendency of the larger claim. It is true that a plaintiff with a large claim has no control over a plaintiff with a small claim proceeding ineptly and losing, but all this means is the plaintiff with the greater claim must establish his case for himself.

## F.

The final distinct factor to be evaluated is that of the use of initiative (*Schwartz v Public Administrator of County of Bronx, supra;* Restatement, Judgments 2d, § 29, subd [3]). As explained in Comment *e* to section 29 of the Restatement of Judgments, Second: *"Failure to effectuate party joinder.* A person in such a position that he might ordinarily have been expected to join as plaintiff in the first action, but who did not do so, may be refused the benefits of 'offensive' issue preclusion where the circumstances suggest that he wished to avail himself of the benefits of a

favorable outcome without incurring the risk of an unfavorable one. Such a refusal may be appropriate where the person could reasonably have been expected to intervene in the prior action, and ordinarily is appropriate where he withdrew from an action to which he had been a party. See also § 42, Comment *d,* on opting out by a member of a class. Due recognition should be given, however, to the normally available option of a plaintiff to prosecute his claim without the encumberance of joining with others whose situation does not substantially coincide with his own".

The value of the initiative was set forth by Professor Currie (Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan L Rev 281, 288): "Plaintiffs possess the initiative — a priceless strategic advantage in litigation as in war. Within broad limits, they can determine the time when and the place where action is to be brought. Moreover, there is latitude for a considerable amount of collaboration between numbers of plaintiffs similarly situated — collaboration which, in fact or in terms of available proof, would fall short of subjecting the collaborators to the binding force of the judgment in the 'test' case. A case in which the factors exciting sympathy for the plaintiff are very strong may be brought in a very inconvenient forum, where the opportunity to present an effective defense is subject to maximum handicaps. The jury may indulge the well-known inclination to render a compromise verdict; in all probability, the jury will act without the slightest understanding of the fact that its verdict may determine the rights of forty-nine (or one hundred and ninety-two) persons who are not parties to the case".

The initiative possessed by plaintiffs leads to results which decrease rather than enhance the positive values that application of the collateral estoppel doctrine is meant to achieve. As stated by the United States Supreme Court in *Parklane Hosiery Co. v Shore* (*supra,* pp 329-330): "First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries.' *Bernhard* v. *Bank of America Nat. Trust &*

*Savings Assn.,* 19 Cal. 2d, at 813, 122 P. 2d, at 895. Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. *E. g., Nevarov* v. *Caldwell,* 161 Cal. App. 2d 762, 767-768, 327 P. 2d 111, 115; *Reardon* v. *Allen,* 88 N.J. Super. 560, 571-572, 213 A.2d 26, 32. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action". I am cognizant of the substantial practical difficulties that would be encompassed in a situation where hundreds of otherwise unrelated plaintiffs would join in a single action, even for purposes of resolving a single issue. At this time this practical problem remains academic, however, because there is no procedural device which exists that would have enabled Con Ed to capture the initiative and resolve the issue of gross negligence in a single action covering all pending claims arising out of the blackout.

## G.

The broad discretion available in applying collateral estoppel, the many factors to be considered, and the flexibility of the doctrine all combine to create a complex and unpredictable area of law. In the multiple claimant anomaly situation, some courts have expressed grave reservations about invoking collateral estoppel against a defendant (*Vincent v Thompson, supra; Berner v British Commonwealth Pacific Airlines, supra; Bahler v Fletcher,* 257 Ore 1), while at least one court has decided that it is against public policy to allow offensive use of collateral estoppel in any multiple claimant cases because such use "would be promotive of litigation and in subversion of sound principles of judicial administration looking to equal justice for all" (*Nevarov v Caldwell,* 161 Cal App 2d 762,

775). I must observe that the complexity of this area of the law seems to promote substantial litigation simply insofar as the question of the applicability of the doctrine of collateral estoppel is concerned, and the goals of consistency, certainty, and judicial economy are not served as a result.

In light of the inconsistent decisions, the new evidence, the size of the original *Food Pageant* verdict relative to the size of the remaining claims, and the absence of an available realistic and practical procedural device which would have enabled Con Ed to seize the initiative, I am able to conclude in this case that the offensive use of collateral estoppel is inapplicable without having to address the question of whether it should ever be applicable in the multiple claimant situation. The facts of each case must be carefully scrutinized (see Currie, Civil Procedure: The Tempest Brews, 53 Cal L Rev 25, 29), and perhaps in certain situations it is fair to invoke collateral estoppel in the multiple claimant situation (see *Hart v American Airlines,* 61 Misc 2d 41). Perhaps it is fair to invoke collateral estoppel against a defendant who has won the first case but lost the next 20. There is no need to pass on these questions at this time.

It is not within the domain of this court to legislate, but I cannot conclude without noting my agreement with Professor Currie's astute observation (Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan L Rev 281, 320) that: "[i]t may be that the only satisfactory way to solve the problem will be to work our way somehow outside the whole framework in which the problem is set — for example, by requiring, so far as possible, that claims arising from a single transaction and involving the same issues be joined or consolidated in a single action." Professor Semmel's insightful article (68 Col L Rev 1457), contains several provocative suggestions regarding expanded concepts of compulsory joinder and class actions. We may have reached a point where the courts can mete out justice in the individual case, but the goals of judicial economy, consistency, and certainty will be best served by legislative initiative. Until such time as legislative action is taken, the judiciary must continue to

expend its best efforts to apply the collateral estoppel doctrine in a manner that best serves the ends of justice in the individual case. Such ends are served here by refusing to apply collateral estoppel against Con Ed on the issue of gross negligence. Accordingly, I respectfully dissent.

BOYERS, J., concurs in the opinion of O'CONNOR, J.; GIBBONS, J., concurs in a separate opinion; THOMPSON, J., dissents and votes to reverse the resettled order insofar as appealed from and to deny plaintiff's motion in its entirety, in an opinion in which DAMIANI, J. P., concurs.

Resettled order of the Supreme Court, Queens County, dated September 13, 1982, affirmed insofar as appealed from, with costs.